UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| AMBER DAWN BLACK and BRANDON BLACK, individually and as next friends of B. BLACK, a minor, | § § § § | |
| Plaintiffs, | § | |
| v. | § | CIVIL ACTION NO. 4:08-cv-3315 |
| | § | |
| TOYS R US- DELAWARE, INC., BUMBO LTD., and BRIGHT IDEAS MANUFACTURING, INC., | § § § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND ORDER**

Pending before the Court is Defendants' Motion Regarding Choice of Law (Doc. No. 87), and Motion to Exclude the Testimony of Ezell Autrey, M.D. and for Partial Summary Judgment. (Doc. No. 88.) Considering the Motions, all responses and replies thereto, and the applicable law, the Court finds that Defendants' Motion Regarding Choice of Law, and Motion to Exclude and for Partial Summary Judgment, should be denied.

I. BACKGROUND[1]

This lawsuit arises out of an incident in which Plaintiffs' infant daughter, B. Black, allegedly fell out of a product known as a Bumbo Baby Sitter ("Bumbo Seat") and sustained a head injury. B. Black's mother, Plaintiff Amber Dawn Black ("Mrs. Black"), first learned of and became interested in purchasing a Bumbo Seat after seeing an advertisement in a magazine at her gynecologist's office in North Carolina. (Black Dep. 45:16-25, Doc. No. 87-1.) Mrs. Black testified that she researched the product on the Internet and, in the process, visited the websites

---

[1] The facts are undisputed unless otherwise indicated.

of Defendants Bumbo Ltd. ("Bumbo") and Toys "R" Us-Delaware, Inc. (Toys "R" Us").[2]  (*Id*. at 47:4-48:23.)  According to Mrs. Black, sometime in July 2006, she went to a Babies "R" Us Store in North Carolina and, after speaking with a sales associate, purchased a Bumbo Seat.[3] (*Id*. at 47:23-25; 48: 1-7.)

Plaintiffs subsequently moved from North Carolina to California and brought the Bumbo Seat with them.  (*Id*. 15:4-12; Black Decl. ¶ 3, Doc. No. 90-1.)  Before relocating, Mrs. Black allegedly did not use the Bumbo Seat with B. Black because the infant was too young to sit up on her own.  (Black Decl. ¶ 2.)  Once in California, Plaintiffs began using the Bumbo Seat and obtained a second one from a Babies "R" Us store in Northern California for use at the infant's grandmother's house and childcare provider.  (*Id*. at ¶ 3; Black Dep. 127:8-128:14.)

Plaintiffs allege that, on November 7, 2006, B. Black fell out of her Bumbo Seat, which Mrs. Black had placed on the kitchen island in the Blacks' California home.[4]  (Black Decl. ¶ 4; Black Dep. 80:5-82:6.)  The infant allegedly struck her head on the kitchen's hard tile floor, sustaining a serious head injury.  (Black Decl. ¶ 4.)  Mrs. Black claims that she was standing only feet away in the kitchen when the accident occurred and suffered severe emotional distress as a result of perceiving the accident.  (Black Dep. 79:4-14; Compl. ¶ 40.)  After hitting her head on floor, B. Black allegedly lost consciousness and was taken to the hospital by ambulance. (Black Decl. ¶ 4.)  Mrs. Black maintains that hospital personnel instructed her to awaken B. Black every two to three hours during the night for the next couple of days due to the risk that

---

[2] Toys "R" Us is the parent company of Babies "R" Us.
[3] Defendants dispute that Mrs. Black purchased the Bumbo Seat in question from a Toys "R" Us store.  Rather, they contend that Mrs. Black received the product as a baby shower gift and that the location of its purchase remains unknown.  They point to a November 2007 Consumer Product Safety Commission ("CPSC") interview report, which states that Mrs. Black received the Bumbo Seat as a gift and did not know from which retailer it was purchased.  The report is redacted, but Mrs. Black admitted in her second deposition that the report refers to her case.  Mrs. Black, however, disputes the accuracy of the CPSC report.
[4] Defendants believe Plaintiffs are mistaken in their recollection that the accident occurred on November 7, 2006. Rather, they contend that the accident occurred on November 6, 2006, as evidenced by B. Black's Pre-Hospital Care Report.  (*See* Doc. No. 88-3.)

the infant's head injury could cause her to slip into a coma.  (Black Dep. 92:2-93:16.)  According to Mrs. Black, she followed the hospital's instructions.  (*Id.*)

Three days after B. Black's fall, Mrs. Black, who was twenty weeks pregnant with twins at the time, delivered her twins prematurely and the babies did not survive.  (*Id.* at 100:9-103:19; 105:10-106:22.)  According to Plaintiffs' medical expert, Amber Black's preterm labor and the subsequent death of her twins was a result of the mental stress and anxiety caused by B. Black's fall from her Bumbo Seat and the subsequent stress and loss of sleep caused by waking the infant throughout the night.  (Autrey Decl. at 2, Doc. No. 88-4.)

Plaintiffs have brought claims against Bumbo Ltd. ("Bumbo"), the South African maker of the Bumbo Seat, Toys "R" Us, the alleged seller of the Bumbo Seat in question, and Bright Ideas Manufacturing, Inc. ("Bright Ideas"), the now defunct U.S. distributor of the Bumbo Seat. Plaintiffs assert claims of strict products liability against all Defendants, negligence, negligent misrepresentation, and malice against Bumbo, negligent failure to warn against Toys "R" Us, and negligent infliction of emotional distress against all Defendants.  (Compl. ¶¶ 14-42.)

Plaintiffs seek compensatory damages arising from B. Black's injuries, as well as for Mrs. Black's mental suffering and anguish resulting from witnessing her daughter's accident. (Compl. ¶¶ 43-45.)  Plaintiffs also seek punitive damages against Bumbo.  (Compl. ¶ 46.)

## II.    MOTION TO EXCLUDE

Defendants have moved to exclude the testimony of Ezell Autrey, M.D. and for Partial Summary Judgment on all of the claims Plaintiffs have asserted in connection with the loss of Mrs. Black's twins.   Defendants argue that Dr. Autrey's opinion is unreliable and merits exclusion under Federal Rule of Evidence 702 and the applicable case law.

### A.  LEGAL STANDARD

Rule 702 of the Federal Rules of Evidence governs the Court's inquiry.  It provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

FED. R. EVID. 702.  Rule 702 was "amended in response to" the Supreme Court's decision in *Daubert v. Merrell Dow Pharms., Inc.* and its progeny.  509 U.S. 579 (1993); FED. R. EVID. 702 advisory committee note.  In *Daubert*, the Supreme Court "set out the standard of reliability of expert testimony."  *Paz v. Brush Engineered Materials, Inc.*, 555 F.3d 383, 388 (5th Cir. 2009).  The Court explained that Rule 702 "assigns to the district judge a gatekeeping role to ensure that scientific testimony is both reliable and relevant."  *Curtis v. M&S Petroleum, Inc.*, 174 F.3d 661, 668 (5th Cir. 1999).  The Court's gatekeeping role requires it to "undertake a two-part analysis."  *Id.*  "The district judge must first determine whether the proffered testimony is reliable, requiring an assessment of whether the reasoning or methodology underlying the testimony is scientifically valid."  *Id.*  "Second, the district judge must determine whether that reasoning or methodology can be properly applied to the facts in issue; that is, whether it is relevant."  *Id.* (citing *Daubert*, 509 U.S. at 592-93).

In the first step of the analysis, which requires the Court to consider whether the challenged testimony is reliable, the Supreme Court advises:

> The subject of an expert's testimony must be "scientific . . . knowledge."  The adjective "scientific" implies a grounding in the methods and procedures of science.  Similarly, the word "knowledge" connotes more than subjective belief or unsupported speculation.  The term "applies to any body of known facts or to any body of ideas inferred from such facts or accepted as truths on good grounds."

*Daubert*, 509 U.S. at 590-91 (quotations omitted).  Thus, "the party seeking to have the district court admit expert testimony must demonstrate that the expert's findings and conclusions are based on the scientific method, and, therefore, are reliable."  *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 276 (5th Cir. 1998).  The *Daubert* Court laid out a list of relevant questions to aid district courts in their determination of whether the scientific methodology in a given case is reliable.  Those factors are:

> (1) whether the theory or technique has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error of the method used and the existence and maintenance of standards controlling the technique's operation; and (4) whether the theory or method has been generally accepted by the scientific community.

*Curtis*, 174 F.3d at 668-69 (citing *Daubert*, 509 U.S. at 593-94).  The Court stressed, however, that these factors were not definitive or exhaustive, a position it subsequently emphasized in *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999).  The *Kumho* Court noted that the *Daubert* "test of reliability is 'flexible,' and *Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case."  526 U.S. at 141.  The factors illuminated in *Daubert* may or may not be apt to a court's reliability determination, depending on the expertise in question, the subject of the testimony, and, generally, "the particular circumstances of the particular case at issue."  *Id.* at 150.  The Court's role is not to mechanically apply the *Daubert* factors, but "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  *Id.* at 152.  Therefore, the "law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination."  *Id.* at 142 (emphasis in original) (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 143 (1997)).

When undertaking the second step of the analysis, which asks whether the proffered expert testimony is relevant, a court must demand "a valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Daubert*, 509 U.S. at 592.  Expert testimony "which does not relate to any issue in the case is not relevant." *Id.*

### B. ANALYSIS

With these principles in mind, the Court now turns to the parties' arguments.  Defendants offer three reasons why Dr. Autrey's opinion should be excluded.  First, they argue that Dr. Autrey's opinion is unreliable because, in reaching his conclusions, he does not cite treatises or peer-reviewed publications to demonstrate that stress, anxiety, and physical activity can cause preterm labor.  Second, Dr. Autrey's opinion should be excluded, Defendants argue, because the hospital did not test for cerebral and other stimulants that, Dr. Autrey concludes, caused Mrs. Black to enter preterm labor.  Without certainty that these stimulants were present, Defendants claim that Dr. Autrey "cannot reliably opine on" their effects.  (Mot. at 4.)  Third, Defendants contend that Mrs. Black could not have been in preterm labor because she was not having contractions when she arrived at the hospital.  In the absence of direct evidence that Mrs. Black experienced contractions, they argue, Dr. Autrey's opinion that she underwent preterm labor is unreliable.

### 1.  Lack of Peer Reviewed Publications

Defendants primary argument is that Dr. Autrey's opinion is unreliable because he does not cite treatises or peer-reviewed publications and, instead, relies only on his education, training, and years of experience as a board certified physician in obstetrics and gynecologist.  Federal Rule of Evidence 702 and the case law interpreting it, however, specifically provide that a witness may be qualified as an expert through " knowledge, skill, experience, training or

education."  Moreover, the Advisory Committee comments to Rule 702 specifically caution against interpreting *Daubert* to require reliance on peer-reviewed publications in every case:

> Nothing in this amendment is intended to suggest that experience alone – or experience in conjunction with other knowledge, training, or education – may not provide a sufficient foundation for expert testimony. . . . In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony.

FED. R. EVID. 702 advisory committee note.  Indeed, as the Supreme Court recognized in *Kumho*, "no one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience."  526 U.S. at 156.  Thus, the Court finds that, contrary to Defendants' assertions, the absence of an expert's reliance on published treatises or journals does not render his testimony per se unreliable.  The Court must ensure, however, that the lack of reliance on peer-reviewed publications does not render Dr. Autrey's opinion unreliable under the circumstances presented here.

The Supreme Court in *Kumho* clearly stated that the *Daubert* factors are not mandatory, nor are they applicable in every situation.  In keeping with this guidance, the Fifth Circuit held that many of the factors were not applicable to a physician-expert's opinion that was derived primarily from observation and professional experience.  Indeed, the court stated:

> [T]his factor [known or potential rate of error] is not particularly relevant, where as here, the expert derives his testimony mainly from first-hand observations and professional experience in translating these observations into medical diagnoses.

*Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 246 (5th Cir. 2002).  Thus, the Fifth Circuit has recognized that an expert may draw a conclusion from a set of observations based on sufficient experience in the relevant field.  *Id*. at 247.  The evidence suggests that Dr. Autrey has practiced medicine for twenty-five years and has been board certified in obstetrics and gynecology for over a decade.  He also possesses extensive experience treating patients who have undergone preterm

labor, including those who had recently suffered severe emotional distress.  (Autrey Dep. 75:14-76:4, Doc. No. 88-6.)   In forming his opinion about the cause of Mrs. Black's premature delivery, Dr. Autrey reviewed Mrs. Black's medical history, records detailing B. Black's accident and its aftermath, and Mrs. Black's medical records from her twin gestation.

After reviewing these records, Dr. Autrey identified, considered, and excluded as viable possibilities alternative causes of Mrs. Black's preterm delivery of her twins, including an incompetent cervix[5] and other stressors that could have caused Mrs. Black to experience increased anxiety at the relevant time.  (Autrey Dep. 33: 9-21; 41:11-15; 43:5-47:9.)  Only after eliminating these other potential triggers of Mrs. Black's early delivery did he determine that it was, within a reasonable degree of medical probability, caused by the stressful events surrounding her daughter's accident.  In *Pipitone*, the Fifth Circuit similarly found that, where the physician-expert eliminated various alternative causes based on generally accepted diagnostic principles related to the medical conditions, the expert's opinion was not unreliable.  288 F.3d at 256-47.

Indeed, Dr. Autrey explained in detail how severe emotional distress combined with the other factors he identified could cause preterm labor.  He testified in his deposition that the mental and physical stressors from which Mrs. Black suffered likely combined to cause the release of any number of endocrine and/or cerebral stimulants, including oxytocin, cortisol, and epinephrine, which instigated premature uterine contractions.  (Autrey Dep. 44:6-80:20.)   Thus, Dr. Autrey testified, based on his education, training, and experience, that a review of the relevant records in this case did not reveal that an incompetent cervix caused a spontaneous

---

[5] In order to arrive at his opinion that Mrs. Black did not suffer from an incompetent cervix, Dr. Autrey explained that she had no history of preterm labor, there was no evidence of cervical trauma or surgery since her three pervious normal deliveries, and that her treating physician had examined her cervix and concluded that it was normal at several points during her pregnancy.

abortion.  Rather, they showed that Mrs. Black had gone into preterm labor, which was likely caused by the mental and physical stress Mrs. Black endured during and in the aftermath of B. Black's accident.   The Court is unable to conclude that Dr. Autrey's failure to rely on publications renders his opinion unreliable, given his experience and qualifications and the systematic manner in which he evaluated and excluded other possible causes of Mrs. Black's preterm delivery.

### 2.   Lack of Cerebral Stimulant Evidence

Defendants next argue that, because the hospital failed to test for the presence of labor-inducing stimulants, Dr. Autrey should not be allowed to testify that he believes such stimulants caused Mrs. Black's preterm labor.  The Court disagrees.  Dr. Autrey testified that, based on his training and experience, these stimulants can cause preterm labor.  (*Id*. at 77:6-81:8.)  It is Dr. Autrey's opinion, after having eliminated other possible causes of Mrs. Black's condition, that these stimulants must have been the cause of her preterm labor.   The fact that Dr. Autrey cannot testify that Mrs. Black's system definitely revealed labor-inducing stimulants the day she lost the twins does not render his opinion unreliable.  Indeed, Dr. Autrey is relying on the surrounding circumstances and the elimination of other causes, which experts must often do in the absence of direct evidence.

### 3.   Lack of Contractions

Because Mrs. Black does not recall having contractions when she arrived at the hospital, Defendants argue that Dr. Autrey's entire testimony should be excluded.  Defendants are correct that Mrs. Black testified that she did not experience what she perceived to be "contractions" until hospital personnel administered the labor-inducing drug, Pitocin.  (Black Dep. 109:6-25.) Defendants also make much of the fact that Dr. Autrey could not point to evidence in the medical

records that Mrs. Black was having contractions.  Dr. Autrey highlighted in his testimony, however, that the medical records supplied to him do not indicate that Mrs. Black was *not* having contractions.  They simply do not reveal the hospital personnel's determination of whether contractions were occurring.  Given that an emergency situation was in progress, it is unsurprising that hospital personnel were not concerned with investigating the cause of Mrs. Black's pregnancy complications.  Thus, they did not necessarily have any reason to test for or note whether Mrs. Black's cervical dilation was caused by contractions or some other trigger.

Despite lacking direct evidence that Mrs. Black was experiencing contractions, Dr. Autrey concluded, based on the totality of the circumstances and the elimination of other possible explanations, that Mrs. Black's cervical dilation was the result of preterm labor.  In his deposition, he explained that lack of perception of contractions is not uncommon among similar patient populations, and thus, the mere fact that Mrs. Black did not report contractions does not undermine his opinion.  Indeed, after Dr. Autrey systematically eliminated an incompetent cervix as the cause of Mrs. Black's early delivery, he concluded that Mrs. Black's four centimeter dilated cervix must have been caused by preterm contractions.  Mrs. Black failed to perceive the contractions, Dr. Autrey concluded, because she was not far enough along in her pregnancy to feel the relatively less intense contractions often associated with early preterm labor.  As such, he provided an explanation, grounded in his training experience, why Mrs. Black, concededly not a medical expert herself, may not have perceived the contractions that dilated her cervix.  In light of the absence of hospital records specifically discussing whether Mrs. Black experienced contractions, and Dr. Autrey's scientifically-grounded explanation for Mrs. Black's lack of awareness of them, the Court cannot conclude that his opinion is unreliable.

## C.  CONCLUSION

Plaintiffs have demonstrated that Dr. Autrey is a qualified expert and that his experience, training, and education provide a sufficiently reliable foundation for his relevant opinion in this case. The *Daubert* factors are not required in all situations and the present case is one such example. The Court is satisfied that Dr. Autrey has brought to "the courtroom the same level of intellectual rigor that characterizes the practice of an expert" in obstetrics and gynecology by engaging in an in-depth analysis of the relevant medical and other records and applying standard diagnostic techniques of to arrive at his conclusions. In short, the potential shortcomings Defendants have identified in Dr. Autrey's testimony go to its weight, not its admissibility. Indeed, "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 595.

Because the Court has denied Defendants' Motion to Exclude Dr. Autrey's testimony, the Court finds that Defendants' Motion for Partial Summary Judgment should be denied.

## III.   CHOICE OF LAW

Defendants have moved for application of North Carolina law to all of Plaintiffs' claims. Plaintiffs object to the application of North Carolina law, and have instead argued that California is the appropriate choice of law under the circumstances.

### A.  LEGAL STANDARD

District courts sitting in diversity apply the choice-of-law rules of the state in which they sit. *Klaxon v. Stentor Elec. Mfg., Inc.*, 313 U.S. 487, 496 (1941); *Mayo v. Hartford Life Ins. Co.*, 354 F.3d 400, 403 (5th Cir. 2004); *Smith v. EMC Corp.*, 393 F.3d 590, 597 (5th Cir. 2004).

Under Texas law, when presented with a choice of law question, the court must first determine whether there is a conflict between the laws of the jurisdictions whose law potentially

controls, and only when such a conflict is present should the Court conduct a choice of law analysis. *See Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 419 (Tex. 1984); *Tobin v. AMR Corp.*, 637 F.Supp.2d 406, 412 (N.D. Tex. 2009). In this case, there is no dispute that a true conflict exists between the laws of North Carolina and California as they relate to several of the core issues in this case. Most notably, California follows a pure comparative fault model. *Li v. Yellow Cab Co.*, 13 Cal.3d 804 (Cal. 1975). By contrast, North Carolina law provides that contributory negligence may bar a plaintiff's recovery. *Smith v. Fiber Controls Corp.*, 268 S.E.2d 504, 506 (1980). The standard for establishing a product's defective design also differs significantly between the states.[6] Finally, California does not set a cap on the punitive damages a plaintiff can recover, whereas North Carolina limits such damages to three times the amount of compensatory recovery, or two-hundred fifty thousand dollars, whichever is greater. CAL. CIV. CODE § 3294; N.C. GEN. STAT. ANN. §1D-25(b). Given the clear conflict between the two states' laws regarding several critical issues in this case, the Court must determine which law should govern.

Texas courts determine the appropriate choice of law by determining which state, with respect to the issues, has the most significant relationship to the occurrence and the parties. In doing so, they apply the "most significant relationship" test provided by Sections 145 and 6 of

---

[6] Under California law, a design is defective under either of two alternative tests: 1) the product failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner, or 2) the product's design proximately caused plaintiff's injury and defendant fails to establish, in light of the relevant factors, that, on balance the benefits of the challenged design outweigh the risk of danger inherent in such design. *Barker v. Lull Eng'g Co.*, 20 Cal.3d 413, 432 (1978). North Carolina law, however, requires a plaintiff to establish that the manufacturer or seller acted unreasonably in designing or formulating the product and that such conduct was the "proximate cause of the harm for which damages are sought," and also prove one of the following: (1) At the time the product left the control of the manufacturer, the manufacturer unreasonably failed to adopt a safer, practical, feasible, and otherwise reasonable alternative design or formulation that could then have been reasonably adopted and that would have prevented or substantially reduced the risk of harm without substantially impairing the usefulness, practicality, or desirability of the product. (2) At the time the product left the control of the manufacturer, the design or formulation of the product was so unreasonable that a reasonable person, aware of the relevant facts, would not use or consume a product of this design." N.C. GEN. STAT. ANN. §99B-6.

the Restatement (Second) of Conflict of Laws.[7]  *Torrington Co. v. Stutzman*, 46 S.W.3d 829, 848

(Tex. 2000); *Gutierrez v. Collins*, 583 S.W.2d 312, 318 (Tex. 1979).   For tort cases, the

Restatement instructs courts to consider the following contacts in determining which state

possesses the most significant relationship:

> (a) the place where the injury occurred,
> (b) the place where the conduct causing the injury occurred,
> (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and,
> (d) the place where the relationship, if any, between the parties is centered.

RESTATEMENT (SECOND) OF CONFLICTS OF LAW § 145 (1971).[8]  These contacts are to be

evaluated according to their relative importance with respect to the particular issue before the

court.  *Spence v. Glock, Ges.m.b.H*, 227 F.3d 308, 312 (5th Cir. 2000).  The number of contacts

is less important than the qualitative nature of those contacts as affected by the policy factors of

Section 6 of the Restatement.  *See Gutierrez*, 583 S.W.2d at 319.  Indeed, Section 6 directs

courts to consider the contacts involved in the case in light of the following general principles:

> (a) the needs of the interstate and international systems,
> (b) the relevant policies of the forum,
> (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
> (d) the protection of justified expectations,
> (e) the basic policies underlying the particular field of law,
> (f) certainty, predictability and uniformity of result, and
> (g) ease in the determination and application of the law to be applied.

*Spence*, 227 F.3d at 311-312.

There are several claims and issues as to which California and North Carolina law differ.

Texas choice-of-law analysis applies to each issue individually.  *Hughes Wood Prods., Inc. v.*

*Wagner*, 18 S.W.3d 202, 205 (Tex. 2000).  Thus, the Court must apply the Restatement test and

evaluate the applicable contacts and policy considerations to determine the most appropriate

---

[7] All references to the Restatement are to the Restatement (Second) of Conflict of Laws unless otherwise indicated.

choice of law for *each* of Plaintiffs' distinct legal claims and other issues that impact the resolution of Plaintiffs' claims, such as contributory negligence and punitive damages.  The Court will first analyze the relevant contacts and then analyze them in light of Section 6's general principles.

### B.  ANALYSIS

#### 1.  The Place Where the Injury Occurred

The Fifth Circuit has held that the location of injury is an "important factor" in determining the most appropriate law to apply.  *Huddy v. Fruehauf Corp.*, 953 F.2d 955, 957 (5th Cir. 1992).  Indeed, under the Restatement, in tort cases, "the applicable law will usually be the local law of the state where the injury occurred."  RESTATEMENT (SECOND) CONFLICT OF LAWS § 156(2) (1971).  Comment "e" to Section 145 of the Restatement explains:

> In the case of personal injuries or of injuries to tangible things, the place where the injury occurred is a contact that, as to most issues, plays an important role in the selection of the state of the applicable law (see §§ 146-147). . . . This is so for the reason among others that persons who cause injury in a state should not ordinarily escape liabilities imposed by the local law of that state on account of the injury.

RESTATEMENT (SECOND) OF CONFLICTS OF LAW § 145 cmt. e (1971).  "Thus, with respect to tort claims, the Restatement emphasizes, but does not mandate, the choice of state substantive law with the greatest connection to the injury plaintiff seeks to remedy."  *Jelec USA, Inc. v. Safety Controls, Inc.*, 498 F.Supp.2d 945, 952 (S.D. Tex. 2007).  Given the emphasis on this factor in the Restatement test, the Court will first identify and discuss the location of the injury in this case.

There is no dispute that Plaintiffs' injuries occurred in California.  B. Black fell out of her Bumbo Seat and struck her head while the Blacks resided in Northern California.  The other

injuries alleged in this case, namely, Mrs. Black's emotional distress, also supposedly took place in California in the immediate aftermath of B. Black's injury.  Indeed, Mrs. Black also went into pre-term labor and delivered her twins at a hospital near the Black's California home, allegedly as a result of the emotional distress caused by B. Black's fall.

Defendants try to minimize the significance of the location of injury in the Restatement analysis by arguing the factor is *not* important when there was "little or no reason for the defendants to foresee" that their actions would result in an injury in California.  (Mot. at 6.) They cite a portion of comment "e" of the Restatement for the proposition that a lack of foreseeability of such an injury taking place in a particular state "is a factor that will militate against selection of the state of injury as the state of the applicable law."  RESTATEMENT (SECOND) OF CONFLICTS OF LAW § 145 cmt. e (1971).  The doctrine of fortuity that Defendants attempt to invoke, however, is not applicable to the facts presented here.  The Court is not persuaded that Defendants had no reason to foresee that the Blacks or any other consumers would use a Bumbo Seat in California.

The Blacks were not fortuitously in California at the time B. Black fell out of a Bumbo Seat.  Indeed, unlike the plaintiffs in the only case Defendants cite, the Blacks were not merely visiting or passing through California.  Rather, Plaintiffs were using the Bumbo Seat in their California home – in the only state where they ever used the product – when B. Black was injured.  Thus, it was not fortuitous that B. Black was injured in California because she lived in California and was very unlikely to have been injured in any other place.  *See Cates ex rel. Cates v. Creamer*, No. Civ.A.7:00CV0121-R, 2001 WL 1196058, *3 (N.D. Tex. Aug. 7, 2001)**,** *rev'd on other grounds, Cates v. Creamer***,** 431 F.3d 456 (5th Cir. 2005); *see also Crisman v. Cooper Indus.,* 748 S.W.2d 273, 278-79 (Tex. App.–Dallas 1988, pet. denied) (Texas law did apply

when a defective trailer was operated solely in Florida thereby allowing injuries to occur only in Florida).

Moreover, as Plaintiffs point out, Bumbo Seats are distributed and sold all over the United States, including at Toys "R" Us stores near the Blacks' home in Northern California. Indeed, because Plaintiffs liked the Bumbo Seat so much, they obtained another one from a store in California, for use at B. Black's grandmother's house and childcare location. Defendants, all participants in the Bumbo Seat's chain of commerce, certainly foresee that individuals in California can be injured by Bumbo Seats they knowingly distribute to and sell in California. In short, the fact that the particular Bumbo Seat that injured B. Black was purchased in North Carolina does not make the prospect of Bumbo Seats injuries in California unforeseeable.

Defendants do not cite a single case for the proposition that there was "little or no reason for the defendants to foresee" that a Bumbo Seat sold in one state would be brought to and used in another. Indeed, the Court is unconvinced that the possibility of consumer relocations to other states is unforeseeable to manufacturers, distributors, and sellers of household products. Rather, the Court finds that, for purposes of choice of law analysis, all of Plaintiffs' alleged injuries occurred in California. As the most significant relationship test instructs, the location of the injury is an important contact, which weighs in favor of applying California law to Plaintiffs' claims.

### 2.   The Place Where the Conduct Causing the Injury Occurred

Under the Restatement, the second relevant contact is the place where the conduct causing the injury occurred. In this case, there are several distinct legal claims and issues, and the location of the relevant injury-causing conduct varies accordingly. Plaintiffs bring claims of strict products liability, negligence, negligent misrepresentation, malice, negligent failure to

warn, and negligent infliction of emotional distress.  There are also two issues that impact the resolution of these claims: the appropriate contributory negligence and punitive damages models. The Court will analyze the location where the conduct that allegedly caused Plaintiffs' injuries occurred for each of these claims and issues.

### a.   Strict Products Liability

With regard to Plaintiffs' strict products liability claims, "the issue in tort . . . is the design, manufacture, and placing in the stream of commerce of a product alleged to have caused injury." *Crisman,* 748 S.W.2d at 277-78 (internal quotations omitted).  In a products liability case alleging defective design, courts generally consider the place where the conduct causing the injury occurred to be the place where the product was designed and manufactured.  *Norwood v. Raytheon Co*., 237 F.R.D. 581, 595 (W.D. Tex. 2006) (citing *Perry v. Aggregate Plant Prods. Co.*, 786 S.W.2d 21, 25 (Tex. App.–San Antonio 1990, writ denied) (holding that the place where the conduct causing the injury occurred was where the product was designed and manufactured)).  The parties do not dispute that the Bumbo Seat at issue in this case was designed and manufactured in South Africa.  Thus, for Plaintiffs' products liability claims alleging defective design, the second factor in the Restatement analysis is neutral with respect to the choice between North Carolina and California law.

### b.   Negligence and Malice

Plaintiffs allege that Bumbo's negligent acts include: negligently designing the Bumbo Seat, negligently testing the Bumbo Seat, Negligently failing to adequately warn of the product's dangers, and negligently marketing the product.  (Compl. ¶¶ 19-23.)  They further allege that Bumbo acted with malice because it had actual knowledge of the danger to children associated with using the Bumbo Seat on an elevated surface, yet it failed to take action to decrease the risk

of injury to children. (*Id*. at ¶¶ 29-32.) As previously noted, the product was designed, manufactured, and packaged in South Africa, and therefore, that country should be considered the primary location of the injury-causing conduct for Plaintiffs' negligence and malice claims. Indeed, based on the evidence in the record, all of the acts or omissions Plaintiffs allege occurred at the company's headquarters in South Africa. In addition, Plaintiffs seek punitive damages against Bumbo for failing to make its product safer despite having knowledge of the dangers. Because all of Bumbo's business decisions happened in South Africa, the place where the conduct causing Plaintiffs' injury for purposes of punitive damages can be properly situated in South Africa as well. Thus, the conduct causing Plaintiffs' injuries did not take place in either North Carolina or California, and the second Restatement factor is therefore neutral with regard to these issues.

### c.  Contributory Negligence

The Court must also determine the state with the most significant relationship to the contributory negligence issue. The Court analyzes the issue here because it is relevant to the resolution of Plaintiffs' products liability claims discussed *supra*. According to the Restatement,"[i]n the great majority of cases, the plaintiff's conduct, which is claimed to constitute contributory fault, will have taken place in the state where he suffered injury. If so, the local law of this state will usually be applied to determine whether the plaintiff's conduct amounted to contributory fault and if so, whether the effect of this fault is to preclude recovery by the plaintiff in whole or in part." RESTATEMENT (SECOND) OF CONFLICTS OF LAW § 164 (1971). Although the Texas Supreme Court has not specifically adopted this section of the Restatement, the Court finds its reasoning persuasive. Here, Defendants allege that Mrs. Black used the product incorrectly and in an unforeseeable manner, and thus, at least in part, caused her

own harm.  The conduct, which Defendants allege caused Mrs. Black's harm (her use of the product on an elevated surface and failure to properly supervise), occurred in California.  Thus, California is the location of the injury causing conduct for purposes of determining which state has a more significant relationship to the contributory negligence issue.

### d.  Negligent Misrepresentation and Negligent Failure to Warn[9]

Plaintiffs also bring a negligent misrepresentation claim against Bumbo and a negligent failure to warn claim against Toys "R" Us.  Plaintiffs allege that Bumbo "misrepresented the character and quality of the Bumbo Seat," in part, by including misleading photographs and statements on the product's package.  (Compl. at ¶ 25.)  Plaintiffs claim that they relied on Bumbo's representations in purchasing and using the Bumbo Seat, and that, but for Bumbo's misrepresentations, Plaintiffs would not have been injured.  (*Id.* at ¶ 28.)  Because Bumbo's packaging was designed and produced in South Africa, at least part of the conduct causing Plaintiffs' injury occurred in that country.

Plaintiffs also contend that Bumbo made these representations, not only through the Bumbo Seat's packaging, but through its advertising and marketing, "the totality of which . . . misrepresented that the product was safe for use in a manner indicated by Bumbo to be suitable for consumers . . . ."  (*Id.* at ¶ 26.)  Although Plaintiffs do not state the source of the objectionable advertising and marketing materials in the complaint, throughout this case, Mrs. Black has indicated that she viewed such misleading photos and product information on Bumbo's website while she was living in North Carolina.

---

[9] The Court notes that the parties' briefing did not address differences in the applicable law for negligent misrepresentation and negligent failure to warn in California and North Carolina.  A cursory review did not reveal significant differences between the states' law in these areas, but the Court will determine the applicable law in the event the parties have identified distinctions that could impact the outcome of the case.

Similarly, Plaintiffs allege that Toys "R" Us negligently failed to warn consumers about the defective nature of the Bumbo Seat and the circumstances that were likely to make consumers' use of the Bumbo Seat dangerous, such as placing it on elevated surfaces.  (*Id*. at ¶ 35.)  Throughout this case, Mrs. Black has maintained that she viewed information related to the Bumbo Seat on the Toys "R" Us website while living in North Carolina, and that she subsequently visited a Babies "R" Us store in North Carolina and purchased a Bumbo Seat after speaking with a sales associate.  Based on the deposition testimony of Toys "R" Us corporate representatives, the company's website marketing content appears to be uploaded at its headquarters in New Jersey.  There is no evidence in the record indicating where Bumbo creates and distributes its marketing materials, although presumably these activities occur in South Africa at the company's headquarters.  It is clear, however, that neither Bumbo's nor Toys "R" Us' marketing materials were created in North Carolina.

According to Plaintiffs' complaint, Mrs. Black then allegedly relied on the companies' representations in purchasing a Bumbo Seat in North Carolina, believing it to be appropriate for use on elevated surfaces, and then again when she used the product in conformity with those representations in California.  It was this reliance, Plaintiffs allege, that caused their injuries.

Although Section 148 of the Restatement governs the choice of law analysis for some misrepresentation claims, whether negligent or intentional, it applies only to actions brought to recover pecuniary damages.[10]  In situations where the false representations result in *physical*

---

[10] Although the Texas Supreme Court has not yet applied this section, this court and other intermediate appellate courts have done so in determining the governing law in fraud and misrepresentation cases.  *See e.g.*, *Tracker Marine, L.P. v. Ogle*, 108 S.W.3d 349 (Tex.App.-Houston [14th Dist.] 2003, no pet.)  Section 148 provides: 1) When the plaintiff has suffered pecuniary harm on account of his reliance on the defendant's false representations and when the plaintiff's action in reliance took place in the state where the false representations were made and received, the local law of this state determines the rights and liabilities of the parties unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the occurrence and the parties, in which event the local law of the other state will be applied.

*injury* to persons or to tangible things, "the applicable law is selected by application of the rules of §§ 146 and 147." RESTATEMENT (SECOND) OF CONFLICTS OF LAW § 148 cmt. a (1971). Thus, the Court will analyze the relevant conduct under Sections 146 and 147 rather than 148. The Court believes, however, that the first three factors in Section 148's analysis are helpful in identifying the relevant locations of potentially injury-causing conduct in the misrepresentation and failure to warn context.

Subsection (a) of Section 148 instructs that the place where the plaintiff acted in reliance upon the defendant's representations is relevant to the analysis. As discussed above, Mrs. Black relied on the representations in both North Carolina and California – first in purchasing, and then in using the product. Under Subsection (b), the location where the plaintiff received the representations is also a factor to consider. Here, it is undisputed that Mrs. Black received at least some representations in North Carolina. Plaintiffs would argue that Mrs. Black also "received" representations when she used the product in California without the benefit of adequate warnings on the box or in the information she received on Bumbo's and Toys "R" Us' websites. Subsection (c) focuses on where the defendant made the representations, which in this case, occurred in New Jersey and South Africa.

---

(2) When the plaintiff's action in reliance took place in whole or in part in a state other than that where the false representations were made, the forum will consider such of the following contacts, among others, as may be present in the particular case in determining the state which, with respect to the particular issue, has the most significant relationship to the occurrence and the parties:

(a) the place, or places, where the plaintiff acted in reliance upon the defendant's representations,
(b) the place where the plaintiff received the representations,
(c) the place where the defendant made the representations,
(d) the domicil, residence, nationality, place of incorporation and place of business of the parties,
(e) the place where a tangible thing which is the subject of the transaction between the parties was situated at the time, and
(f) the place where the plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant. RESTATEMENT (SECOND) OF CONFLICTS OF LAW § 148 (1971).

Defendants contend that with respect to Plaintiffs' "marketing and warning claims,"[11] North Carolina is the place where the conduct that caused the injury occurred because Mrs. Black researched and purchased the Bumbo Seat in North Carolina. Plaintiffs counter that North Carolina is not the place where the injury causing conduct occurred because the marketing materials were not created in North Carolina and the Internet marketing Plaintiff consumed in North Carolina was not limited to that state. Indeed, Mrs. Black could have accessed the same content from a computer anywhere in the country. Plaintiffs cite a case from the Northern District of Texas holding that, where marketing decisions took place in multiple locations and advertising and marketing was disseminated on a nationwide scale, no one state predominated for purposes of defining where the injuring-causing conduct occurred. *See Burleson v. Liggett Group Inc.*, 111 F.Supp.2d 825, 830 (E.D. Tex. 2000). The Court arrived at this conclusion even though the plaintiffs both viewed advertisements and purchased the product in Texas, one of the jurisdictions whose law potentially controlled. *Id*. at 828. Plaintiffs also argue that Mrs. Black relied on Bumbo's representations that the product was safe for use on elevated surfaces, and was not adequately warned by Toys "R" Us against such a use, when she was in California. Essentially, Plaintiffs urge, Mrs. Black relied on the representations and was not warned at the moment she used the product in a way that caused injury. Thus, Plaintiffs argue, California should be the location of the injury-causing conduct.

The Court is tasked with weighing the significance of the relevant conduct in relation to Plaintiffs' claims to determine the most appropriate place to locate the injury-causing conduct. Given the splintered nature of the conduct giving rise to Plaintiff's negligent misrepresentation and negligent failure to warn claims, the Court finds that this factor does not weigh heavily in

---

[11] The Court presumes that Defendants are referring to Plaintiffs' negligent misrepresentation and negligent failure to warn claims in its Motion on Choice of Law.

favor of applying either North Carolina or California law.  Indeed, as in *Burleson*, much of the important conduct – the creation of the representations that allegedly caused Plaintiffs' harm – occurred outside of either jurisdiction whose law potentially controls.  Although Mrs. Black viewed the Internet marketing content in North Carolina, as in *Burleson*, they were available all over the country, not directed specifically at North Carolina consumers.  Thus, the Court finds that neither California nor North Carolina predominates for purposes the second Restatement factor.

### e.  Negligent Infliction of Emotional Distress

Plaintiffs also allege that Defendants were negligent in designing, manufacturing, distributing, and selling the Bumbo Seat and that Defendants' negligence was a substantial factor in causing the serious emotional distress and physical pain that Mrs. Black suffered as a result of her daughter's accident.  (Compl. ¶ 41-42.)   As discussed *supra* with regard to Plaintiffs' products liability claims, the design and manufacture of the product occurred in South Africa. As with the design and manufacture of the product, the distribution of the product did not occur in either North Carolina or California.  The sale of the product, however, allegedly did take place in North Carolina.  With the vast majority of the conduct occurring outside of either state, however, the Court finds that no state predominates with regard to the location of the injury-causing conduct for Plaintiffs' negligent infliction of emotional distress claim.[12]

---

[12] Although the parties do not discuss the difference between North Carolina and California law with respect to negligent infliction of emotional stress, it appears that the severity of the distress required to make out a claim may be higher in North Carolina.  Under North Carolina law, "Severe emotional distress, which is element of tort of negligent infliction of emotional distress, means any emotional or mental disorder, such as, for example, neurosis, psychosis, chronic depression, phobia, or any other type of severe and disabling emotional or mental condition which may be generally recognized and diagnosed by professionals trained to do so." *Johnson v. Ruark Obstetrics*, 395 S.E.2d 85, 97 (1990). (internal quotations omitted)  Mere temporary fright, disappointment or regret will not suffice.  *Id.*  California, on the other hand, recognizes that serious mental distress may be found "where a reasonable [person] normally constituted, would be unable to adequately cope with the mental distress engendered by the circumstances of the case." *Thing v. La Chusa*, 48 Cal.3d 644, 668 n.12 (1989) (quoting *Rodrigues v. State*, 52 Hawaii 156, 173 (1970)).

### f.   Relationship Between the Restatement Factors

Thus, for all of Plaintiffs' substantive legal claims and the punitive damages issue, the second Restatement factor does not weigh in favor of either California or North Carolina.  As for contributory negligence, however, California is the appropriate location of the injury-causing conduct.  Section 146 of the Restatement provides guidance as to the interaction between the first and second factors when they occur in different locations:

> On occasion, conduct and personal injury will occur in different states.  In such instances, the local law of the state of injury will usually be applied to determine most issues involving the tort (see § 145, Comments *d-e*, and §§ 156-166 and 172).  One reason for the rule is that persons who cause injury in a state should not ordinarily escape liability imposed by the local law of that state on account of the injury.  Moreover, the place of injury is readily ascertainable.  Hence, the rule is easy to apply and leads to certainty of result.  The local law of the state where the personal injury occurred is most likely to be applied when the injured person has a settled relationship to that state, either because he is domiciled or resides there or because he does business there.

RESTATEMENT (SECOND) OF CONFLICTS OF LAW § 146 cmt. 5 (1971).  Thus, ordinarily, even if, as with plaintiffs' substantive law claims and the punitive damages issue, the conduct causing the injury and the injury itself took place in different locations, "the local law of the state of injury will usually be applied to determine most issues involving the tort."  Applying the law of the state of injury is even more likely when, as here, the injured party resided in the state where the accident occurred.  The Court notes that, despite Section 146's emphasis on the place of injury, it is not dispositive.  Indeed, the Supreme Court of Texas in *Gutierrez* specifically overruled the *lex locus delicti* rule.  *See Aguiniga,* 9 S.W.3d at 260; *see also Gutierrez,* 583 S.W.2d at 318.  Recognizing, however, that under the first two factors of the analysis, California exhibits the most significant relationship, the Court turns to the remaining factors in the Restatement analysis.

### 3.  The Domicile, Residence, Nationality, Place of Incorporation, and Place of Business of the Parties

An analysis of the third relevant contact in the Restatement inquiry also reveals that no single location predominates.  The Fifth Circuit has held that the location of a party's residence at the time of the injury controls his residence for choice of law purposes.  *Huddy Fruehauf Corp.*, 953 F.2d at 957.  Plaintiffs unquestionably resided in California when the accident occurred and thus, their residence for choice of law purposes is California.  Bumbo is a South African company with its principal place of business in South Africa.  Toys "R" Us is a Delaware corporation and New Jersey is its principal place of business.  Bright Ideas was at the relevant time a New Jersey corporation that maintained its principal place of business in New Jersey.  Thus, Plaintiffs resided in California during the relevant period, but none of the parties was located in North Carolina.  Given the scattered nature of the parties, this factor does not weigh heavily toward the application of either state's law.

### 4.  Location of the Relationship, if Any, Between the Parties

Finally, the fourth factor requires consideration of "the place where the relationship, if any, between the parties is centered."  RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145(2)(d) (1971).  "When there is a relationship between the plaintiff and the defendant and when the injury was caused by an act done in the course of the relationship, the place where the relationship is centered is another contact to be considered." *Id.* cmt. e.

In this case, the only arguable relationship Plaintiffs have with any of the Defendants is a single transaction.  Defendants make much of the fact that Mrs. Black acquired the product in North Carolina, arguing that "the *only* direct or indirect interaction between the plaintiffs and the defendants occulted in North Carolina where Mrs. Black researched and then purchased her

Bumbo Seat.  It follows that North Carolina is the *only* state where the relationship between the parties could be centered."  (Mot. at 9.)  The Court agrees the only interaction between any of the Defendants and Plaintiffs took place in North Carolina.  Case law demonstrates that, for products liability actions, however, the relationship between the parties is centered where the product was designed and manufactured.  *See Perry*, 786 S.W.2d at 25.  As discussed, the product here was designed and manufactured in South Africa.  Therefore, for Plaintiff's products liability, negligence, malice, and negligent infliction of emotional distress claims, this factor is neutral.  For Plaintiffs' negligent misrepresentation and negligent failure to warn claims, the interaction between Mrs. Black and Defendants is arguably more relevant than in the products liability context.  Given the extremely limited relationship between Plaintiffs and Defendants, however, the fact that their only interaction took place in North Carolina does not weigh heavily in favor of concluding that North Carolina possesses the most significant relationship to those claims.

### 5.  Policy Considerations Outlined in Section 6

Finally, the Restatement directs the Court to consider the applicable contacts in light of the general policy considerations outlined in Section 6.  The most significant of the seven factors to the facts of this case are "the relevant policies of the forum" and the "relevant policies of the interested states and the relative interests of those states in the determination of the particular issue."  RESTATEMENT (SECOND) OF CONFLICTS OF LAW §6(b),(c) (1971).

### a.  Forum State

As the forum state, Texas' policy related to the claims at issue in this case is relevant to the choice of law analysis.  Texas case law reveals that "[t]he Texas legislature and courts have developed an almost paternalistic interest in the protection of consumers and the regulation of the conduct of manufacturers that have business operations in the state."  *Mitchell v. Lonestar*

*Ammunition*, 913 F.2d 242, 250 (5th Cir. 1990) *(citing Dow Chemical Co. v. Alfaro,* 786 S.W.2d 674 (Tex. 1990)).   Indeed, Texas maintains an interest "in protecting its citizens from, and compensating them for, injuries resulting from defective products."   *Baird v. Bell Helicopter Textron,* 491 F.Supp. 1129, 1150-1151 (N.D. Tex. 1980).   Thus, Texas' relevant policy supports protecting consumers from defective products such as the Bumbo Seat involved in the present case.   *See Aguiniga*, 9 S.W.3d at 260.

### b.  Interested States

The laws of California and North Carolina present contrary positions on several of the key points of law in this case, in part, as a result of divergent policy judgments.   Plaintiffs argue that, like Texas, California has a strong interest in ensuring that its residents are protected from defective products that are used within its borders.   *Disaster at Detroit Metropolitan Airport on August 16, 1987*, which Plaintiffs cite, explains that California's strict product's liability laws reflect a desire to 1) regulate culpable conduct occurring within its borders, 2) induce corporations to design safe products and deter future misconduct, and 3) impose financial repercussions, which have been incurred by the user of the defective product.   750 F. Supp. 793, 802 (E.D. Mich. 1989).   Defendants acknowledge California's policy concerns and interest in the application of its law, but argue that North Carolina has a more substantial interest.   Defendants explain that North Carolina's tort laws express a strong commitment to promoting trade and commerce, particularly with respect to the sale of products in the state.

The Court is charged with analyzing these policy considerations in light of the facts presented in this case.   Here, Plaintiffs were California residents at the time their injuries occurred.   Thus, California's policy judgment as to the importance of protecting residents from defective products is clearly implicated.   On the other hand, none of the Defendants is a resident

of North Carolina.  In *Mitchell*, the Fifth Circuit held that North Carolina had little governmental interest in the resolution of the parties' claims and defenses because there was no North Carolina manufacturer involved as a defendant in the lawsuit.  The court therefore concluded that there existed "no compelling reason why the North Carolina legislature would have an interest in the application of its statute to eliminate the claims of foreign plaintiffs against foreign defendants." 913 F.2d at 249-250.  Thus, Defendants' focus on North Carolina as the location of the product's *sale* is misplaced.  It appears that the Fifth Circuit found that North Carolina's more stringent products liability laws were intended to protect its own manufacturers, and that in the absence of a North Carolina defendant, the state lacked a significant interest in the application of its laws.

For all of these reasons, the Court finds that California has the strongest interest in the application of its laws to the case presented here.

### C.  CONCLUSION

Based on the applicable factors laid out in Sections 145 and 6 of the Restatement, the Court finds that California has the most significant relationship to all of Plaintiffs' substantive legal claims as well as the two issues the parties identified as impacting the resolution of those claims.  Indeed, the injury occurred in California in the Plaintiffs' own home.  None of the Defendants is located in North Carolina, the state whose law they urge should govern this matter, nor did the vast majority of the conduct that caused Plaintiffs' injuries occur in that state. Looking to the final factor, the parties' relationship consisted of a single transaction.  Although that transaction occurred in North Carolina, that state is only properly considered the center of the parties' relationship for Plaintiffs' negligent representation and negligent failure to warn claims.  This weak connection between the parties is certainly not sufficient to overcome the important fact that the injury took place in California.  Moreover, when viewing Section 145's

factors in light of the Restatement's general principles as applied to the issues in this case, it is clear that California's policy goal of protecting its residents from defective products, a policy that is consistent with that of the forum state, demonstrates California's strong interest in the application of its law.   Finding that California has the most significant relationship to the occurrence and the parties, the Court denies Defendants' Motion Regarding Choice of Law.

**IT IS SO ORDERED**.

**SIGNED** at Houston, Texas, on this the 10th day of November, 2010.

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE